## CIRCUIT COURT OF LOUDOUN COUNTY

William Evans-Smith

v.

John B. Taylor, warden,
Staunton Correctional Center

February 1, 1993

Case No. (Law) 13577

BY JUDGE JAMES H. CHAMBLIN

As set forth in detail under Findings of Fact and Conclusions of Law, the Amended Petition for Writ of Habeas Corpus is denied and dismissed for the following reasons:

(1) Even if the information given to Investigator Jay Merchant by Karen Spalding on the morning after the murder is considered after-discovered evidence, no relief is available under *Fitzgerald* v. *Bass*, 6 Va. App. 38 (1988), because after-discovered evidence does not constitute a basis for habeas relief;

(2) The information given to Merchant by Spalding is clearly exculpatory evidence, but under *United States* v. *Bagley*, 473 U.S. 667, 105 S. Ct. 3375 (1985), such evidence is not material; and

(3) The information given by Spalding to Merchant is exculpatory evidence coming under the doctrine of *Brady* v. *Maryland*, 373 U.S. 83, 83 S. Ct. 1194 (1963), and its progeny and is not evidence, potentially useful to the defense but lost due to the bad faith of the police, under the doctrine of *Arizona* v. *Youngblood*, 488 U.S. 51, 109 S. Ct. 333 (1988).

## Findings of Fact and Conclusions of Law

After a jury trial this Court on August 11, 1989, sentenced the Petitioner, William Evans-Smith ("Petitioner" or "Evans-Smith") consistent with the jury verdict to twenty years in the penitentiary on a conviction of second degree murder of his wife, Barbara Evans-Smith ("Barbara"). The Petitioner's petition for direct appeal was denied by the Court of Appeals on June 1, 1990, and by the Supreme Court of Virginia on September 14, 1990.

On May 14, 1992, Evans-Smith filed herein a petition for writ of habeas corpus attacking his conviction on the basis of what he alleges as newly discovered material exculpatory evidence not disclosed to him prior to trial. The evidence concerns statements made to Investigator Jay Merchant of the Loudoun County Sheriff's Department by Karen Spalding the morning following the murder about a person she had seen walking on the road near the gate to the Evans-Smith farm where Barbara had been murdered.

As a result of a hearing herein on July 8, 1992, on the Respondent's Motion to Dismiss the original Petition, the Court allowed the Petitioner to amend his petition. He filed an Amended Petition on July 29, 1992, to which the Respondent filed an Answer on September 8, 1992. The Amended Petition alleges that the Spalding statements are both material exculpatory and after-discovered evidence, but if they are not deemed such, then they are potentially useful evidence lost due to the bad faith of the police under *Arizona* v. *Youngblood*, 109 S. Ct. 333 (1988).

On September 21, 1992 this Court set a hearing to determine what information was given to Merchant by Spalding and whether the facts concerning Spalding's report to Merchant were available to Evans-Smith so as to have been included in his prior habeas corpus proceeding. The hearing was held on January 12, 1993.

### I. Findings of Fact

A. *Spalding Report*

As a part of the investigation of the murder, Merchant conducted a "road check" on Route 725 near the Evans-Smith farm early on the morning of Tuesday, April 16, 1985. At the time Merchant knew that Barbara had been murdered in the residence on the farm the previous day, April 15, 1985, and had been told by Dr. George Hocker, the

Loudoun County Medical Examiner, that he estimated her time of death to have been 6:00 to 6:30 A.M. give or take one to two hours. Merchant arrived for the "road check" at about 4:30 A.M. and stayed until about 8:30 A.M.

During the "road check" Merchant stopped every vehicle to determine if anyone saw or heard anything at the time the murder occurred. He stopped a total of twenty-two vehicles, and he made notes concerning each vehicle he stopped. The notes were made in a spiral bound notebook. He made notes at the time he spoke to the occupants of each vehicle he stopped. He identified the notebook at the hearing, but the notebook itself was not admitted into evidence.

Karen Spalding and her family were living in April 1985 at a house on Route 725 a short distance east of the Evans-Smith farm. The Spalding family was living there temporarily while their fire damaged house near Purcellville was being repaired. Spalding's daughter attended Lincoln Elementary School in Lincoln, Virginia, which is west of the Evans-Smith farm.

The morning of April 16, 1985, Spalding was driving her daughter to school when she was stopped on Route 725 near the Evans-Smith property by Merchant. She was headed west on Route 725 toward Lincoln Elementary School when she was stopped at 7:36 A.M. He asked and obtained from Spalding her name, address and telephone number. He asked her how often she travelled Route 725 and on what days. She told him that she usually came by about 8:00 A.M. taking her daughter to school. He told her that there had been a murder and asked if she had seen or heard anything. She replied negatively. He gave her his card and asked her to call him if she knew anything. Merchant made contemporaneous notes of his stops of Spalding. (Respondent's Exhibit 2.)

Spalding worked in McLean, Virginia, in April 1985. She proceeded to work after dropping off her daughter at school. She had to be at work by 9:00 A.M. Sometime after the stop, but the same day, Spalding remembered having seen someone walking on Route 725 near the Evans-Smith farm. She called and left a message for Merchant to call her. Later the same day Merchant returned the call to her.

In the telephone conversation Spalding told Merchant that on the previous Thursday or Friday she saw a person walking on Route 725 toward Lincoln near the Evans-Smith farm at about 8:00 A.M. She told him that it was a white male wearing a jean jacket, jeans and a baseball

hat. She said he was in his late 20's or early 30's and had a reddish-brown beard. Merchant told her that someone would get back in touch with her, but no one ever did. Merchant made contemporaneous notes of this conversation. (Respondent's Exhibit 4.)

Merchant made his notes of both the stop and the telephone conversation in the same notebook. He had notes of all twenty-two vehicle stops of which Spalding's stop was the tenth. On the next page of the notebook after the notes of the twenty-second stop are Merchant's notes of his telephone conversation with Spalding.

Although Spalding talked with her husband the evening of April 16, 1985, about these events, she did not discuss them with anyone other than him until May 1992. In November 1991 Spalding went to work for the law firm of David H. Moyes, one of the attorneys who had represented Evans-Smith at trial. In May 1992 during a discussion with a co-worker at the law firm, Spalding mentioned the events of April 16, 1985. As a result, this information was provided to present counsel for the Petitioner and led to the filing of this habeas petition.

Spalding does not know Blair D. Howard, the other attorney who represented the Petitioner at trial, and she does not know the Petitioner.

### B. *Proceedings Before Trial*

Evans-Smith was directly indicted only eight days after the murder. He was released on bond. Because he was indicted directly, Evans-Smith did not have the benefit of a preliminary hearing. He remained free on bond until the jury at his second trial found him guilty on April 27, 1989. The Petitioner has been in custody since that date.

On May 3, 1985, defense counsel filed a discovery motion which included in paragraphs 2 and 3 thereof requests for exculpatory evidence under *Brady* v. *Maryland*, 83 S. Ct. 1194 (1963). (Petitioner's Exhibit 4.)

A hearing was held before Judge Carleton Penn on May 16, 1985, which concerned the defense discovery motion. From the representations of defense counsel to the Court at the hearing the Commonwealth was clearly aware that the defense knew that the Commonwealth had interviewed over fifty persons; that the defense's investigation indicated that some of those persons had stated things that would not support the Commonwealth's theory of the case; that the defense was aware that the Commonwealth's case was entirely circumstantial; that

the defense's theory was that a person or persons other than Evans-Smith committed the murder; that the defense saw that the Commonwealth's investigation had narrowly focused only on Evans-Smith; and that the defense needed to follow up on exculpatory evidence right away.

As a result of that hearing the Court ordered the Commonwealth to produce exculpatory evidence and ordered further that if there was any doubt as to whether or not evidence was exculpatory, then it shall be presented to the Court for *in camera* inspection. *See* order entered May 23, 1985, Petitioner's Exhibit 6. It was to be a continuing order. The Court asked the Commonwealth to file its theory of the case confidentially with the Court to be used by it in inspecting any statements *in camera*.

On May 16, 1985, trial was set to commence on August 13, 1985.

The Commonwealth filed a written discovery response on May 23, 1985, which produced statements of the Petitioner, but not anyone else (Petitioner's Exhibit 7), and an "Answer to Motion for Exculpatory Evidence" which stated: "None known to the Commonwealth at this time." "Pursuant to Court order all witness statements will be presented to the Court for *in camera* inspection." (Petitioner's Exhibit 8.)

The Petitioner had hired his own private investigators to help him in his defense. The defense acquired information that two individuals had provided the Commonwealth with the reports of suspicious incidents close in time and place to the murder. As a result, a further discovery motion was filed on August 2, 1985. (Petitioner's Exhibit 9.)

A hearing was held before Judge Penn on August 5, 1985. He considered it to be an *in camera* pre-trial conference and excluded the public. Before the hearing Judge Penn had received from the Commonwealth its theory of the case as well as certain data of the knowledge of witnesses that could arguably be exculpatory. When Mr. Howard raised the issue of the defense's desire to have the Commonwealth produce "any reports regarding suspicious activity of vehicles and persons" (Transcript page 24, Petitioner's Exhibit 10), Judge Penn immediately went into reviewing approximately ten written reports of statements of persons previously supplied by the Commonwealth for *in camera* inspection. The Court ruled all the reports to be exculpatory and gave them to the defense. At least one of the statements concerned suspicious events that occurred approximately two weeks prior to the murder (the "Gefaell Statement"; see page 2 of Petitioner's Exhibit 12).

Defense counsel brought up other information that had come to their attention about suspicious activity and its being reported to the Sheriff's Department. Judge Penn suggested that the defense ask for a *subpoena duces tecum* directed to the Sheriff's Department. The defense followed his suggestion.

On August 8, 1985, a hearing was held before Judge Penn on the petitioner's request for a *subpoena duces tecum* to the Sheriff's Department for reports of suspicious vehicles and persons from March 15, 1985, to April 20, 1985. At the hearing Judge Penn ordered the production of all memoranda concerning statements made by Tracy Dillon and Elaine Monroe for *in camera* inspection and that the *subpoena duces tecum* be issued in usual form returnable the first day of trial, August 13, 1985.

Evans-Smith's first trial commenced August 13, 1985. On August 30, 1985, the jury found him guilty of second degree murder and fixed his punishment at five years in the penitentiary. He was sentenced, but his conviction was reversed by the Court of Appeals on October 20, 1987. *Evans-Smith* v. *Commonwealth*, 5 Va. App. 188 (1987).

The Commonwealth decided to retry Evans-Smith. On January 11, 1988, the Petitioner filed a discovery motion which included a request for exculpatory evidence under *Brady*. (Petitioner's Exhibit 14.) On January 21, 1988, the Commonwealth filed a written response stating:

> The Commonwealth is unaware of any evidence subject to the
> rules of discovery which was not provided or made known to
> the defense either prior to or during the first trial of this case.

(Petitioner's Exhibit 15.)

The Commonwealth filed two supplemental discovery responses (Petitioner's Exhibits 16 and 17) but each concerned only statements of the Petitioner.

This Court granted a suppression motion filed by the Petitioner. The Commonwealth appealed, and the Court of Appeals reversed. After the delay caused by this appeal, the second trial started on April 17, 1989. The jury returned its verdict on April 27, 1989.

At no time did the Commonwealth reveal to the Petitioner or any of his attorneys the existence of Spalding's statements to Merchant on April 16, 1985. At no time did the Commonwealth produce any memorandum or notes of her statements to the Court for *in camera* inspec-

tion and ruling. Evans-Smith did not learn of Spalding's statements until May 1992.

## II. *Conclusions of Law*

### A. *After-Discovered Evidence Claim*

The petitioner argues that he is entitled to habeas relief because the statements and observations of Karen Spalding constitute after-discovered evidence. Assuming that such could be construed as after-discovered evidence under the four-part test recently reiterated in *Carter* v. *Commonwealth*, 10 Va. App. 507, 512 (1990), after-discovered evidence does not constitute a basis for habeas relief. *Fitzgerald* v. *Bass*, 6 Va. App. 38, 46 (1988). Very simply, the purpose of a habeas proceeding is not to determine the petitioner's guilt or innocence but to test the legality of his incarceration.

All relief requested by the petitioner in this proceeding on account of or based upon after-discovered evidence is denied.

### B. *Material Exculpatory Evidence Claim*

In *Brady* v. *Maryland*, 83 S. Ct. 1194 (1963), the United States Supreme Court held that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material to either guilt or punishment. Implicit in the requirement of materiality is a concern that the suppressed evidence might have affected the outcome of the trial. *United States* v. *Agurs*, 427 U.S. 97 (1976).

Borrowing upon the standard imposed in cases involving incompetence of defense counsel announced in *Strickland* v. *Washington*, 466 U.S. 668, 104 S. Ct. 2052 (1984), the United States Supreme Court in *United States* v. *Bagley*, 105 S. Ct. 3375 (1985), held: We find the *Strickland* formulation of the *Agurs* test for materiality sufficiently flexible to cover the "no request," "general request," and "specific request" cases of prosecutorial failure to disclose evidence favorable to the accused. The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome.

The *Bagley* approach has been adopted by the Virginia Supreme Court, *Correll* v. *Commonwealth*, 232 Va. 454 (1987), and the Virginia Court of Appeals, *Carter* v. *Commonwealth*, 10 Va. App. 507 (1990).

In order for Evans-Smith to be granted habeas relief this Court must find that (1) the Spalding statements to Merchant constitute exculpatory evidence and (2) the exculpatory evidence is material. For the reasons set forth below, this Court finds:

(1) that the information reported by Spalding to Merchant is clearly exculpatory evidence, but

(2) that under the *Bagley* approach such evidence is not material.

(1) *Exculpatory Nature of the Spalding Report*

As early as May 16, 1985, about three months before the first trial, the Commonwealth's Attorney was well aware that Evans-Smith contended that someone else had committed the murder. The Commonwealth was well aware that the area in which the murder occurred was rural, and, accordingly, it was not an area where one would expect a great amount of vehicular or pedestrian traffic. Hence, any information of an unrecognized or suspicious vehicle or person in the area at a time not too remote from the offense would be exculpatory. Judge Penn recognized this and so ruled when he ordered the "Gefaell Statement" of an event occurring two weeks prior to the murder be produced to the defense.

This Court feels that the evidence of Spalding's statements to Merchant are clearly exculpatory given all the circumstances of this case. Therefore, any argument that the defense did not ask specifically for notes of Merchant's "road check" is of no consequence.

Any argument that the reports are not exculpatory because Spalding said she saw the unknown person on Thursday or Friday before the Monday morning murder and not that morning is not accepted by this Court. A perpetrator could have been observing the farm and its occupants in preparation of committing an offense such as a burglary. He could have been prevented from committing an offense the day he was seen by Spalding only to return Monday morning to commit the murder.

Both the Commonwealth and the defense knew that the evidence against the Petitioner was entirely circumstantial. In such a case the existence of evidence that tends in any way to show that the defendant is not guilty is exculpatory. Evidence that an unknown male was

present near the farm even three or four days before the murder must be deemed exculpatory.

The examination of Merchant's notes by the Questioned Document Branch of the United States Secret Service (Respondent's Exhibit 5) found "no indication to suggest the questioned entry (notes of the telephone conversation with Spalding on April 16, 1985) was falsely dated." As an agent of the Commonwealth, Merchant had written notes of exculpatory information on April 16, 1985. The Commonwealth was certainly aware of the "road check" of Merchant because five witnesses (James Anderberg, Ralph Clark, Mark Simms, Bill Packard and Bart Johnston) testified for the Commonwealth as to the absence of suspicious vehicles on Route 725. All five of these witnesses were stopped by Merchant during the "road check" on April 16, 1985. The Court is aware of this from having examined *in camera* copies of Merchant's notes tendered to the Court by Mr. McLees at the hearing herein on September 21, 1992. These copies were sealed by the order entered herein on September 23, 1992. The Court sees no need in light of the evidence presented on January 12, 1993, for these copies to remain sealed; and, accordingly, orders them to be unsealed and filed herein.

Merchant is an experienced investigator. At the time of this investigation he had been with the Loudoun County Sheriff's Department since February 1984 having retired after twenty years service with the Fairfax County Police Department. A police officer with that much experience in criminal investigations should reasonably be expected to have a basic knowledge of the principles of *Brady* and exculpatory evidence. It goes without saying that, of course, the Commonwealth's Attorney was aware of *Brady* and its requirements. No explanation was offered as to why Spalding's statements as reported to Merchant one day after the murder were not produced to defense counsel other than the argument, which this Court rejects for reasons set forth above, that the statements are not exculpatory.

This Court cannot turn its back without comment on the response of Merchant when the petition herein was filed and it came to light that Evans-Smith had learned of Spalding's statements. Despite the fact that Merchant made notes on April 16, 1985, of both the road stop and the telephone conversation (the notes being no more than five pages apart in a relatively small notebook), in his affidavit dated June 1, 1992, Merchant states that he had "no notes or memoranda" of the

telephone conversation. Spalding's affidavit filed with the petition says she talked on the phone with Merchant "a day or two" after she was stopped by Merchant. Merchant acknowledges in his affidavit of June 1, 1992, that he read Spalding's affidavit. The notes of the telephone conversation come right after the notes of the last stop on April 16, 1985. Also, in his affidavit Merchant states that his notes from the road check were given to defense counsel before trial pursuant to a discovery order of this Court. There was absolutely no evidence presented that the notes were given to defense counsel or why Merchant would have made such a statement under oath.

In his second affidavit dated September 21, 1992, and filed with the Answer to the Amended Petition, Merchant states that after reviewing his notebook he found the notes about the telephone conversation. No questions were ever asked of Merchant at the hearing as to why he did not discover the notes of the telephone conversation (located directly after the road check notes) until after making the first affidavit. Merchant stated he made notes in his notebook chronologically. He did not state he made notes in any other place. If he knew Spalding contended she talked to him a day or two after the stop, it seems to this Court that Merchant would have known exactly where to look without any difficulty for any notes of the telephone conversation. The notes are exactly where one would expect them to be considering when Spalding said in her affidavit that she called Merchant and the method he used to take his investigative notes.

Although it is not relevant or material to this proceeding why the statements were not produced, this Court cannot just merely look away from the circumstances of the nondisclosure when it considers the importance of the Evans-Smith prosecution, the severity of the offense, the defense's theory at trial, the continuing protestation of innocence by Evans-Smith, the rulings of Judge Penn before the first trial as to other information he deemed exculpatory and the involvement of an experienced prosecutor and investigator. In its first written discovery response the Commonwealth even stated that it would present all witness statements to the Court for *in camera* inspection, but obviously it did not do so. Considering the pre-trial circumstances of this case, it is very difficult to understand the failure to produce Spalding's statements to the defense.

Spalding's statements in light of all the circumstances of this case are exculpatory.

## (2) *Materiality of the Spalding Reports*

The materiality issue must be addressed from two aspects. First, this Court must consider what defense counsel could have done or would have done differently if the Spalding statements had been revealed to them. Second, this Court has to consider what the effect would have been on the result of the trial if Spalding's evidence had been presented to the jury.

Mr. Moyes testified at the hearing that if defense counsel had known of Spalding's statements to Merchant, then they would have investigated everyone in the neighborhood and looked for a match to the unknown hairs found at the crime scene. The defense would have conducted further investigation of people near the murder scene and would have pursued further forensic tests. However, the Petitioner gave no specifics of exactly what additional investigation of the neighborhood his private investigators would have pursued. Mr. Moyes testified that Evans-Smith spent close to $100,000.00 on private investigators, but there was no evidence of exactly what they did in their investigation of people in the neighborhood. There was no evidence of what the investigators did not pursue but would have pursued if they had been aware of Spalding's statements to Merchant.

Spalding lived close to the Evans-Smith farm at the time of the murder yet there was no evidence that the defense had interviewed her or any member of her family before trial. If the defense's theory was someone else perpetrated the crime, then it seems logical to at least ask the occupants of all the nearby homes if they had seen or heard anything. Also, the defense's investigators could have conducted a "road check" similar to the one that Merchant performed.

The defense was well aware (from Evans-Smith's own observations) of suspicious activity on Route 725 at or about the time of the murder. This should have been enough to cause the defense to investigate the presence of suspicious vehicles or persons at that time. The Petitioner has not particularized anything unusual or peculiar to Spalding's statements that would have caused the defense to investigate in a different manner.

Granted that if the defense had known of Spalding's statements, then she could have been interviewed close in time to her observations which would likely result in a clearer recollection and the development of more details. To say that she might have then provided information that could have led to the identity of the person that she saw is sheer

speculation. It is common sense that the observations that would have led to a specific identification of the person are the observations that she would most likely continue to recall to this day. Her recollections as presented at the hearing do not provide anything that would tend to identify the person she saw that morning.

The Petitioner argues that if he had been aware that Spalding had seen a person as she said, then his defense could have pursued additional forensic testing. He did not particularize or specify what testing. Perhaps tests could be done as to the hairs found at the scene if the person Spalding saw was found. But it is sheer speculation that the person could have been found. All forensic tests were available to the defense as to any item found at the crime scene. The Petitioner has failed to show what would have been done differently as to forensic testing if the defense had been aware of Spalding's statements.

This Court would have to speculate as to what other things the defense could have done and what the results would have been if the defense had been advised before trial of Spalding's report. The Petitioner has presented nothing to show that it would have been even probable that having knowledge of Spalding's statements the person could have been located by the defense. Even if the person were located, one would have to again speculate that the person would have provided exculpatory evidence. The presence of the person on a public road where he had a right to be does not automatically in and of itself implicate him in a nearby murder.

It is certainly reasonable to assume that if the defense had known of Spalding and her report to Merchant, then the defense would have called her as a witness. If she had testified to seeing a person on Route 725, even if on the morning of the Thursday or Friday before the Monday murder, then it would have been admissible at trial. However, this Court cannot find exactly what her testimony would have been or what it would be if she had testified at a prior trial or would testify at another trial if held. For example, she told Merchant in the telephone conversation of April 16, 1985, that the person had a reddish-brown beard and she stated in her affidavit filed with the petition that the person had blond hair but no beard, but at the hearing she testified that the person had blondish-brown hair and did not mention a beard. Also, in her affidavit she stated that she called Merchant within a day or two of the stop, but at the hearing she testified definitely that she called Merchant the day of the stop. Further, at the hearing she testified to

other information about the person which she did not relate to Merchant on April 16, 1985, e.g., the person had his head down and a baseball cap pulled down over his eyes. On September 17, 1992, Spalding gave a statement to the State Police that she had seen the person the "day before, two days before" she was stopped and the person had blond hair. The Court cannot overlook that Spalding was working for the law firm of one of Evans-Smith's trial attorneys at the time her statements came to light in May 1992.

Even if Spalding testified at trial that the man she saw had blond or brownish-blond hair, the Commonwealth could have impeached her by Merchant's testimony of her prior inconsistent statements to him that the man had a reddish-brown beard.

Even though the case against Evans-Smith was entirely circumstantial, there was sufficient circumstantial evidence presented at trial to convict him. There is no need to review that evidence here as this Court reviewed it in detail in its opinion letter of July 21, 1989, when the motion to set aside the verdict for insufficient evidence was denied. This ruling has been reviewed by the Court of Appeals and the Supreme Court of Virginia, and neither court reversed that decision.

The jury heard evidence of at least two other suspicious incidents and/or persons near in place and time to the murder but found the Petitioner guilty. This Court is of the opinion that even if the jury had received evidence of a suspicious unknown person with blond hair on Route 725 near the Evans-Smith farm on the morning of the murder, the result would have been the same despite the evidence of one blond hair of unknown origin (not forcibly removed, but fallen out) found on the stairway leading to the bedroom where Barbara was found and one hair of unknown origin found near her hand. There was no evidence of a forced entry. There was no evidence of any outside dirt, mud or moisture being tracked inside the house. The Commonwealth's forensic scientist, Deanna Dabbs, testified at length at the trial about how unknown miscellaneous hairs can be present at a crime scene. This Court is of the opinion that even if the jury had heard Spalding's testimony, there is no reasonable probability that the outcome would have been different.

For the foregoing reasons, this Court finds that even though Spalding's statements to Merchant are exculpatory, the statements are

not material because there is no reasonable probability that, had the evidence been disclosed to the defense, the result would have been different. Accordingly, the Petitioner is denied any habeas relief on the ground of the failure to disclose exculpatory evidence.

C. *Claim of Loss of Potentially Useful Evidence Because of Bad Faith of the Police*

The Petitioner asserts in his Amended Petition that the statements of Spalding to Merchant should be considered as evidence potentially useful to the defense which was lost due to the bad faith of the police in violation of his due process rights citing *Arizona* v. *Youngblood*, 109 S. Ct. 333 (1988). The Petitioner sets forth in fifteen paragraphs over two and one-half pages allegations of various actions by the Sheriff of Loudoun County and two Sheriff's Department investigators, Merchant and Jeff Brown, which "reveal a pattern of bad faith" on the part of the police.

This Court is of the opinion that *Youngblood* only applies to evidentiary material in the hands of the prosecution that becomes lost or destroyed before the defense could test it, and the test results might have exonerated the accused. *Youngblood* does not apply to statements or observations of witnesses of which the prosecution may have knowledge because such statements or observations come under the *Brady* doctrine. *Youngblood* deals with evidence that never became available to help the defense. Such is not the case here because the Petitioner eventually became aware of the Spalding statements. *Brady* concerns exculpatory evidence known to the prosecution whereas *Youngblood* concerns evidence that if preserved would have been potentially useful to the accused. *Youngblood* deals with items such as blood samples, clothing or other items of physical evidence which are no longer available for the defense's experts to analyze and test for the defendant's benefit. Even if Merchant's notes are considered evidentiary material under *Youngblood*, the notes have not been lost or destroyed, and the Petitioner has not articulated how he was prejudiced by not having Merchant's actual notes as opposed to merely not having the information related to Merchant by Spalding.

*Youngblood* is not applicable to the facts as alleged by the Petitioner or as presented at the hearing. The allegations of bad faith, therefore, even if true, are immaterial and not relevant to this proceeding. Any

relief on the basis of an alleged *Youngblood* violation is denied to the Petitioner.

Evans-Smith may not have liked how he was treated by the police officers, but nothing has been alleged to show that his rights were violated. He is entitled to a fair trial, not a perfect trial. This Court is of the opinion that he received a fair trial in April 1989. Insensitivity, discourtesy and overzealousness of police officers may be distasteful to Evans-Smith (and they are to this Court, but surely to a lesser extent), but the incidents alleged do not arise to a constitutional deprivation.

## Conclusion

For the reasons stated herein, the Amended Petition for Writ of Habeas Corpus is denied, and it is dismissed. Petitioner is advised of his right to appeal this decision.